### THE DOWNTOWNER CORPORATION
*v.* Gordon SCOTT

74-89                                                     513 S.W. 2d 910

Opinion delivered September 30, 1974

*Fred E. Harrison & Thomas E. Downie,* for appellant.

*Troy Wiley,* for appellee.

LYLE BROWN, Justice.   Appellant Downtowner Cor-

poration instituted this suit to require Gordon Scott to account for profits from the operation of the Red Apple Inn during a period from June 1, 1972, through November 7, 1972. The critical issue in the case is which party is entitled to the profits made during the stated period.

Downtowner Corporation owned a large land development at Eden Isle, Arkansas, which included Red Apple Inn, a resort hotel, and related recreational enterprises. On March 1, 1972, Downtowner gave Block Investment Company an option to purchase the entire Eden Isle properties. Negotiations toward that end began to go forward and in late May it appeared that the sale was near closing.

Scott, manager of the Red Apple Inn, learned of those negotiations in March 1972. Since Block's interest was mainly in the land development, appellee reached a separate agreement with Block to purchase Red Apple Inn if and when it was acquired from Downtowner. The Scott-Block agreement was expressed in a written offer dated May 4 and accepted by Block on May 8. It was essential to Scott that he have the benefit of the profitable summer months to offset the loss which would expectedly occur in the winter months. The contract contained a provision to that effect. Thereafter, various officers of Downtowner, at different times, became aware of the Scott-Block agreement.

On May 31 Downtowner sent Loel Holder, an employee, to Red Apple Inn to conduct an inventory and accounting of receivables and cash on hand. Afterwards Holder signed a memorandum prepared by Scott's attorney and dated May 31, to which was attached a typed schedule reflecting a summary of the audit and inventory. That document in most part contained language identical to Scott's May 4th contract with Block, including the following:

> Scott to assume all obligations incurred after June 1, 1972, except depreciation and taxes or other assessments and Scott to have the benefit of all income accrued and earned during that portion of time between June 1, 1972, and closing date.

The purpose of Holder's visit, the scope of his authority,

and the effect of the May 31st memorandum are in dispute. Downtowner contends Holder was sent to establish certain values as of May 31 so that at its closing with Block the sale of Red Apple Inn would be retroactive to that date. Downtowner contends Holder was a part-time accountant who had no authority to bind Downtowner to a contract. Scott contends Holder was sent to turn over the operation of the Inn to him, Scott, pursuant to his contract with Block. Scott contends he also had assurance from a Downtowner official, Mr. Perkins, that Downtowner would sell the Inn to Scott if the Block-Downtowner deal was not consumnated.

On July 12 Holder again went to Red Apple Inn and effected a "reconciliation of funds", in essence giving Downtowner credit for funds collected prior to June 1 but earned thereafter, such as advance deposits. The balance owing Downtowner was $13,605.26 and Scott gave Holder a check in that amount.

From June 1 until November 7 Scott operated the Inn independent of any real control by Downtowner, although some objections were voiced to Scott in June by Fred Eydt, Vice President of Operations for Downtowner. During that period Scott retained the income, paid the daily expenses, and placed the receipts in accounts he had set up under his sole control. Downtowner continued to pay taxes, insurance, and mortgage payments totalling over $50,000.

During that summer the sale from Downtowner to Block began to fall apart and in early September negotiations finally were terminated. Scott then submitted Downtowner a written offer which was substantially the same contract Scott had made with Block. Following a refusal of that offer there were further negotiations and Scott and his attorney thought a meeting of the minds had been reached. On November 7 Downtowner officials went to Eden Isle and assumed control of the Inn from Scott and put in a new manager. An inventory was taken at that time to establish cash on hand and accounts receivable which Downtowner retained. Scott retained the profits and all records of his operation from the period June 1 through November 7. In December Downtowner sent Scott a number of bills incurred during his operation and he paid them.

In January 1973 Downtowner brought this action against Scott for an accounting of the profits of his operation. Scott answered and counterclaimed, seeking recovery for certain capital improvements and for receivables collected and retained by Downtowner which had been earned prior to November 7. The chancellor found that a contract existed between the parties either expressly, by ratification, or by estoppel, whereby Scott would operate the Inn, not as an employee or agent of Downtowner, but as an independent operator under which Scott would retain what he made or assume any loss incurred. The petition for accounting was consequently denied. As to Scott's counterclaim, the chancellor found that if Scott was entitled to any recovery thereunder it should be retained by Downtowner as rent.

We cannot agree with the chancellor's conclusions while at the same time conceding that the suit presented a difficult and novel question for which no parallel can be found in any prior decision. We find there was in fact an agreement based on the sincere belief of all parties that a sale to Scott would be consummated and that such sale would be retroactive to June 1. That agreement allowed Scott to get the advantage of the summer business; however, the retention of those profits was conditioned on the closing of a sale to Scott.

In the first place the testimony of Scott warrants such a conclusion. The chancellor propounded this question to Scott: "Were you working on the theory all the time when you were running this business that you were going to buy the business?" Scott answered in the affirmative. At another point in his testimony Scott testified: "I assumed I would end up owning the property involved". Scott also conceded there was no discussion as to who would get the net profits during his period of operation. He said he was standing on the written documents.

In further support of our conclusion we examine the written instruments introduced into evidence. The first one is the offer to purchase executed by Scott and addressed to Block. It provided that in the event the sale was not consummated by June 1, the operation and management would be turned over to Scott on that date and he would retain the profits accruing between June 1 *and closing date*. Then, under

date of May 31 Scott executed a memorandum to Down-towner, to Block, and to the banks which proposed to finance Scott. It was in effect an amendment to the written offer of May 4. It provided, among other things, that the operation and management of the Inn would be transferred to Scott on June 1 and that he would thereafter retain all profits *until clos-ing date*. Again, under date of September 12, 1972, after the proposed sale to Block had collapsed, Scott made a written offer to Downtowner. Therein it was stated that Scott would retain all income accrued and earned from June 1, 1972, *until closing date*. We think it abundantly clear there had to be a closing of the sale to Scott before he was unconditionally en-titled to retain the summer profits.

Appellant Scott finds himself in a position which is un-tenable, namely, that he was entitled to the profits from the operation, come what may, and regardless of whether there was ever a closing of any sale of the property to him. Again, the agreement to buy and sell was not open-ended; it was based on a contingency of a closing.

The principle of estoppel is of no benefit to Scott; that is because we find no estoppel. There can be no estoppel because Scott did not show that he relied on representations, inaction, or silence of Downtowner to his detriment. *Bowlin* v. *Keifer*, 246 Ark. 693, 440 S.W. 2d 232 (1969). As to represen-tations, Scott concedes that the only representations made about the profits were contained in the recited contracts. As to inaction or silence there was no occasion for Downtowner to speak out about the profits until the sale to Scott collapsed. Furthermore, there is no evidence in the record that Scott suf-fered any detriment.

Nor can we find any evidence that Downtowner com-mitted any act of ratification whereby Scott was vested with the sole right to the profits during his period of operation. It is undisputed that if a closing had been effected then Scott was entitled to the profits; therefore, there was no cause for Downtowner to demand the profits until the sale became an impossibility.

The chancellor laid stress on the memorandum of May 31 from Scott to Downtowner and seems to conclude that

since the instrument was approved for Downtowner by Holder, it constituted a contract between the parties. If it be conceded that the instrument did form a contract between the parties, we simply cannot interpret it to mean that Scott was entitled to the profits of a sale which was never consummated.

The cause is remanded with directions to conduct an accounting of the operation from June 1 to November 7 and to enter judgment accordingly. In that connection it is noted Downtowner appears to concede in its brief that in an accounting Scott should be credited with his salary "and possibly an extra amount should he be able to establish services over and above those he had previously exerted in operation of the Inn as well as credit for expenditures or improvements of a capital nature made in good faith. . . ."

Reversed and remanded.

BYRD, J., dissents.